## Kling Estate

*Smith, Cahill & Aker* and *Benjamin R. Shanken,* for proponents.

*Wallace M. Keely, Kirke Bryan,* and *Allen R. Keely,* for caveators.

TAXIS, P. J., November 14, 1956.—This estate comes before the court upon certification by the register of wills that a difficult and disputable question has arisen as to the grant of letters. The record so certified by the register of wills indicates that on December 12, 1955, Joseph Kling, Jr., petitioned the register of wills for letters of administration upon the assets comprising the estate of his father, Joseph Kling, Sr., who died on November 16, 1955, a resident of Upper Moreland Township, Montgomery County. On December 17, 1955, Helen J. Jones, daughter of decedent,

filed a caveat with the register of wills against the granting of letters of administration to Joseph Kling, Jr. On January 26, 1956, Joseph Kling, Jr., petitioned the register of wills for probate of a writing alleged to be the last will and testament of Joseph Kling, Sr., and for letters of administration c. t. a. That writing contained on page 70 of journal notebook reads as follows:

"Joseph Kling Jr.

"If anything happens to me take over it is yours my wife Helen Ruth gets nothing

Your Father    Pop"

No further steps were taken by the register of wills aside from certifying this record to the orphans court on June 11, 1956.

On June 14, 1956, counsel for proponents and for the caveators filed a stipulation in which they agreed that the questions to be resolved by the court are:

1. Is the above writing testamentary in character?

2. Is it "signed by the testator" within the meaning of section 2 of the Wills Act of April 24, 1947, P. L. 89?

3. Does the writing effectively specify disposition of the corpus of decedent's estate?

Hearings on these questions were held on July 6, July 20 and July 27, 1956.

### Is This Writing Testamentary in Character?

Blackstone defined a will as a "legal declaration of a man's intentions, which he wills to be performed after his death", and this definition is still the law of Pennsylvania. Thus a writing is testamentary in character if it appears that it was decedent's purpose to make a posthumous gift. I have little difficulty in concluding that the language of the above disputed writing indicates that such was decedent's intention. The words "if anything happens to me" are a clear

indication of testamentary intent and have been so construed by the Supreme Court in Kimmel's Estate, 278 Pa. 435. Although the writing is an informal paper in the nature of a note addressed to the son of decedent, the informal character of the writing is merely an element in determining testamentary character. The informality becomes a matter of no importance when it appears that decedent's purpose was to make a posthumous gift: Kauffman Will, 365 Pa. 555, 557; Kisecker's Estate, 190 Pa. 476. In addition, the proponent in this case is fortified in his position by the presumption against intestacy: Walker Estate, 376 Pa. 16.

Although it is apparent that the writing on its face is testamentary, in an abundance of caution extrinsic evidence was heard pertaining to the testamentary character of the writing and its consequent appropriateness for probate and also to aid the court in determining whether testator had made an effective testamentary disposition. ". . . if we find that the disputed paper was written by the decedent, intending that it should be her will it is probatable, with its meaning a matter of will construction, even though, when construed, it may not constitute an effective testamentary disposition. Burtt Will, 353 Pa. 217; Tranor's Estate, 324 Pa. 263": Kauffman Will, supra, 561.

From the extrinsic evidence adduced, it was established that the disputed writing was found on page 70 of a book in which decedent kept a record of all his important transactions, for example, the record of his wages, names and birthdates of his children, and a list of certain bonds. In addition the location of the book is significant. The book was found in decedent's bedroom on a shelf with other important papers all of which were kept under lock and key. It would seem natural to conclude that this location would be appro-

priate for storage of decedent's will as well as for his other important records.

Caveators called several witnesses to testify that decedent on various occasions had stated that he had no will. Other witnesses indicated that testator had made contrary statements to them. The conflict is unimportant in view of the established principle of law that if a writing is in legal effect a will, understanding of testator to the contrary is immaterial: Thompson Will, 375 Pa. 193.

In view of the nature of the writing in question and the extrinsic evidence adduced at the hearing I conclude that the writing is testamentary in character. *Is the Writing "Signed by the Testator" Within the Meaning of section 2 of the Wills Act of 1947?*

Section 2 of the Wills Act of April 24, 1947, P. L. 89, reads in parts pertinent:

"Every will, . . . shall be in writing and shall be signed by the testator at the end thereof. . . ."

It is unnecessary for a testator to sign his full name at the end of a will in order to make it effective. The test is whether or not what is offered as a purported signature was made by testator with the intent that such be his signature. It is apparent from the writing that the word "Pop" appears "at the end thereof". The question then is simply whether testator intended that the word "Pop" be his signature. Extrinsic evidence is admissible to aid in such determination: Kehr Will, 373 Pa. 473.

There is no doubt that the word "Pop" is in the same handwriting as the other words appearing in this holographic will. There is a conflict in the testimony as to whether decedent referred to himself as "Pop" or by other appellations such as "Dad" or "your father". This conflict is understandable in light of the family relationships existing between decedent, the

proponent and the caveators of this will. Joseph Kling, Jr., the proponent, and his sister, Kay Kling Boerner, were the children of decedent by his first marriage, which was dissolved by the death of decedent's wife. Decedent apparently referred to himself to both of the children of this first wife as "Pop". When decedent remarried, this custom was changed with regard to the children born of the second marriage. To them decedent referred to himself as "Dad". It was only natural that when addressing Joseph, Jr., in this disputed writing that decedent referred to himself as "Pop". I conclude, therefore, that when decedent placed the appellation "Pop" at the end of this writing he intended it to be his signature. The provisions of section 2 of the Wills Act of 1947 have been satisfied.

## Does the Writing Effectively Specify Disposition of the Corpus of Decedent's Estate?

The key to determining whether or not this writing is dispositive are the words "it is yours". The question is simply, what did testator mean by the word "it"? This pronoun, standing alone, conveys no meaning whatsoever. It is only the juxtaposition of this word to others in the same context that lends any significance to this term. If at all possible it cannot be assumed that testator intended the word to be a superfluity and therefore treated as a nullity. Rather we must search the context in which the word is employed for any other words which will give it meaning. This approach was employed in Hart v. Stoyer, 164 Pa. 523, where the word "it" was used and where the question was resolved by reference to other language in the will modifying this pronoun. Of the few words in the disputed writing only the word "nothing" sheds any light on the problem. Testator clearly expressed his desire to disinherit his wife by stating

in the phrase immediately following "my wife Helen Ruth gets nothing". Thus testator plainly stated that his wife was to get none of his estate. At this point decedent was contemplating his entire estate. It seems only logical to conclude that his attention was also directed toward his entire estate only in terms of the positive when he wrote the preceding phrase "it is yours". If his wife was to get nothing, to whom was his estate to devolve? "It", the entire estate, was to go to Joseph Kling, Jr. There is no other object to which the word "it" could reasonably apply.

Caveators resist the above interpretation basing their objection in part on the theory that Joseph, Jr., was not the natural object of testator's bounty. The bulk of the extrinsic evidence produced by the caveators was directed toward proving a debtor-creditor relationship between Joseph, Jr., and decedent, and toward further demonstrating that Joseph, Jr., was particularly laggard, to the distress of his father, in repaying these debts. Aside from the testimony of numerous witnesses that Joseph, Jr., admitted the existence of the debt, amounting to roughly $3,500, caveators placed great emphasis on the fact that Joseph had mortgaged his house for $6,000, although his outstanding debts other than that owed to his father, amounted to only roughly $2,500. The natural implication of these financial transactions, it is argued, is that Joseph would not have mortgaged his home for this particular sum had he not been indebted to his father, as alleged by the caveators.

Assuming, arguendo, the existence of this debt, it is of little probative value in determining whether the scrivener of the disputed writing intended Joseph, Jr., to be the sole heir of his estate to the exclusion of decedent's other children. The disputed writing is undated, yet there was testimony from one witness

that it was seen in decedent's record book as early as 1938. Circumstances surrounding testator at the time of the execution of the writing in question are relevant and helpful for the purpose of interpreting this document. The attitude of testator toward Joseph as affected by the existence of an unpaid debt during the years from 1952 to the date of decedent's death has no bearing on the meaning of an instrument executed in the late 1930's. If decedent's attitude was in fact altered by Joseph's debtor relationship toward him, and if it was his consequent desire to exclude Joseph from participation in his estate, it was incumbent on testator to revoke the writing appearing on page 70 of his ledger book. The change in attitude without any such affirmative action by testator has no bearing on the dispositive character of the document in question.

Caveator has further argued that the word "yours" should be interpreted to mean all the children of decedent as distinguished from decedent's second wife who was to get nothing, and should not be interpreted to refer to only one child, namely Joseph. The word "yours" like the word "it" is a pronoun and as such derives more specific meaning when considered with other words used in the same context. This writing begins with the words "Joseph Kling, Jr.", and it would be most unlikely that testator was referring to anyone other than Joseph Kling, Jr., when two lines later he makes the statement "it is yours".

I conclude that this disputed writing meets both the formal and substantive requirements of a valid will as defined by the statutes and law in this Commonwealth.

And now, November 14, 1956, it is ordered and decreed that the record be remanded to the register of wills and that the writing described in this opinion be probated as decedent's last will.